**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CAROLINE ROBINSON,** | |
| **Plaintiff,** | |
| v. | **Civil Action No.  09-2294 (JEB)** |
| **DISTRICT OF COLUMBIA,** *et al.*, | |
| **Defendants.** | |

<u>**MEMORANDUM OPINION**</u>

On March 6, 2009, an unmarked police car collided with a motorized dirt bike in the Shaw neighborhood of Northwest Washington, D.C.  A Metropolitan Police Department Officer, Michael Pepperman, drove the police car; 20-year-old Arnell Robinson (Arnell) rode the dirt bike.  As a result of the crash, Arnell suffered a transected aorta and died later that evening at a nearby hospital.  His mother, Caroline Robinson (Robinson), brought suit on behalf of herself and her deceased son.  She claims Pepperman and the District are responsible for Arnell's death – the former because he caused the collision on purpose, the latter because the city encouraged its police force to tamp down on illegal dirt-bike riding with dangerous tactics like those allegedly employed by Pepperman.  Robinson seeks damages under D.C.'s wrongful-death and survival statutes for both constitutional and state-law violations.  With discovery complete, both sides now move for summary judgment.  The Court will grant Defendants' Motion in part, concluding that Counts X and XII are duplicative of Plaintiff's other claims, and that the evidence does not support the Fourth Amendment violation alleged in Counts I and XIII.  But because the testimony remains at odds over how the crash unfolded, the Court concludes that summary judgment is otherwise inappropriate for either side at this stage.

1

I.      **Background**

The parties vigorously dispute the fine-grained details of how the crash that sits at the heart of this case actually came about.  Making matters more difficult for the Court, Plaintiff neglected to file with her consolidated Opposition and Cross-Motion for Summary Judgment either a statement of material facts or a concise statement of genuine issues, as required by this district's Local Rules for civil cases.  See LCvR 7(h).  More on that later.  In any event, as both sides move for summary judgment on certain issues, it would be inappropriate for the Court to view the facts in the light most favorable to one or the other.  Instead, the Court will recount the evidence, noting agreements and disputes.

The parties seem to concur that the crash took place before 3:00 p.m. on March 6, 2009, on a section of O Street N.W. between 5th Street (to the West) and New Jersey Avenue (to the East).  See Pl. Opp./Mot., ECF No. 94 (Add'l Exhibits), Attach. 20 (Injured Property Report) at 1; Def. Mot., Exh. 1 (MPD Interview of Michael Pepperman) at 7:3-4; id., Exh. 19 (Use of Force Report) at 5.  Although no document explicitly says so, the various descriptions of that section of O Street indicate that it is an east-west, two-way street, made somewhat narrow by the presence of parked cars on either or both the north and south sides of the street.  See Pepperman Interv. at 14:22-15:2.  Three speed bumps also cut across the roadway at various points.  See Use of Force Rep't at 5.

Pepperman was behind the wheel of an unmarked Ford Taurus, driving eastbound on O Street with his partner, Officer Gina Leveque.  See Defendants' Statement of Facts (DSOF), ¶ 2; Pepperman Interv. at 6:3, 7:7–22.  The two police officers were conducting unrelated business, traveling to an address elsewhere in the District for purposes of preparing a search warrant.  See DSOF, ¶¶ 3–4.  Somewhere along the 400 block of O Street – after crossing 5th Street but before

reaching New Jersey Avenue – Pepperman saw three dirt bikes driving westbound in his

direction.  See id., ¶ 7.  Arnell rode one of the bikes, Kelvin Hoffman a second, and Lamont Hall

the third.  See Pl. Opp./Mot., ECF No. 92 (Mot. for Leave to File Out of Time), Attach. 3

(Declaration of Kelvin Hoffman); id., Attach. 5 (Declaration of Lamont Hall).

At this point, the narratives diverge.  According to Pepperman, he initially saw the dirt-

bike riders after driving over the first of three speed bumps east of 5th Street.  See Def. Mot.,

Exh. 3 (Declaration of Michael Pepperman), ¶ 5.  They were headed towards the car three

abreast, with some or all of them occupying Pepperman's (eastbound) lane of traffic.  See id.;

Def. Exh. 2 (Deposition of Michael Pepperman) at 127:2-3, 147:7.  Ostensibly to make "room on

both sides of [the] vehicle for the . . . motor bikes to pass" between the Taurus and the cars

parked on both sides of the street, Pepperman "stopped [his] vehicle in the middle of the

roadway."  Pepperman Depo. at 144:1-3; see id. at 144:9-12; Pepperman Decl., ¶ 5.  Although it

is illegal to operate dirt bikes on city streets, see D.C. Code § 50-2201.04b(a) ("No person shall

operate at any time . . . [a] dirt bike on public property . . . in the District."), Pepperman "was not

contemplating taking any police action against [Arnell] or the other individuals riding dirt

bikes . . . at the time of th[e] incident."  DSOF, ¶ 10.

As the three dirt bikes approached Pepperman's car, Arnell "sped up and rode ahead of

the other two dirt bikes," "turn[ing] his head and . . . looking over his left shoulder for several

seconds."  Pepperman Decl. ¶ 7.  When Arnell eventually straightened his head to look forward,

he was "approximately four to five car lengths" from the Taurus.  See id., ¶ 8.  It was only then,

Pepperman claims, that Arnell first saw the Taurus, at which point he "turned the handle bars of

his dirt bike to the left," "plant[ing] his right foot on the ground" as the dirt bike "started to go to

the ground."  Id., ¶¶ 8–9.  The "dirt bike slid under [the] police car," but Arnell's "momentum

caused him to be propelled into a parked car," not the Taurus.  Id., ¶¶ 9–11.  Pepperman insists

that he had no intention of causing a crash or otherwise colliding with the dirt-bike riders, and

that, at the moment of impact, the Taurus was completely stationary.  See id., ¶ 11; DSOF, ¶ 8.

   In Plaintiff's telling, as Arnell and his fellow riders drove westbound on O Street, they

remained within their dedicated (westbound) lane of travel.  See Hoffman Decl. at 2 ("[A]ll three

bikes remained in the Westbound lane of traffic north of the middle of O Street the entire length

of 400 block of O Street.").  Without warning, according to the other two riders and bystander

Adam Wilson, the unmarked Taurus swerved from the eastbound lane, crossing over the

centerline of O Street into the westbound lane, where it partially blocked the bike riders' path.

See, e.g., id. at 2; Hall Decl. at 1; ECF No. 92, Attach. 9 (Declaration of Adam Wilson) at 2-3.

Arnell collided with the Taurus, which was still moving forward at the moment of impact,

landing on the pavement somewhere between the driver's side of the Taurus and a car parked on

the north side of O Street.  See Wilson Decl. at 3; ECF No. 92, Attach. 7 (Deposition of Kenneth

Lindsay) at 37:13–38:14; ECF No. 92, Attach. 8 (Deposition of Gina Leveque) at 112:8–20.

   The parties once again agree on the tragic aftermath of the collision: Arnell died later that

evening from injuries he suffered in the crash.  See DSOF, ¶ 13.  Robinson filed this suit on

December 3, 2009.  After Judge Emmet G. Sullivan, to whom this case was previously assigned,

dismissed Plaintiff's Fourteenth Amendment counts and denied Pepperman's claim of qualified

immunity, see Robinson v. District of Columbia, 736 F. Supp. 2d 254, 260, 263 (D.D.C. 2010),

the case proceeded through a lengthy and contentious period of discovery.  With discovery

finally complete, the parties have now filed competing Motions for Summary Judgment.

## II.       Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  "A fact

is material if it 'might affect the outcome of the suit under the governing law,' and a dispute

about a material fact is genuine 'if the evidence is such that a reasonable jury could return a

verdict for the nonmoving party.'"  Steele v. Schafer, 535 F.3d 689, 692 (D.C. Cir. 2008)

(quoting Anderson, 477 U.S. at 248).  In assessing cross-motions for summary judgment, as here,

each motion must be considered individually, and the facts relevant to each must be viewed in

the light most favorable to the non-movant.  See Quigley v. Giblin, 569 F.3d 449, 453 (D.C. Cir.

2009); see Mellen v. Bunting, 327 F.3d 355, 363 (4th Cir. 2003).

The non-moving party's opposition must consist of more than mere unsupported

allegations or denials, and it must be supported by affidavits, declarations, or other competent

evidence setting forth specific facts showing that there is a genuine issue for trial.  See Fed. R.

Civ. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The non-moving

party is required to provide evidence that would permit a reasonable factfinder to find in her

favor.  Laningham v. United States Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  A "mere . . .

scintilla of evidence" in support of the non-movant's position is insufficient to defeat a motion

for summary judgment.  Anderson, 477 U.S. at 252.  And if the non-movant's evidence is

"merely colorable" or "not significantly probative," summary judgment may be granted.  Liberty

Lobby, Inc., 477 U.S. at 249-50; see Scott v. Harris, 550 U.S. 372, 380 (2007) ("[W]here the

record taken as a whole could not lead a rational trier of fact to find for the non-moving party,

there is 'no genuine issue for trial.'") (quoting <u>Matsushita Electric Industrial Co. v. Zenith Radio</u>

<u>Corp.</u>, 475 U.S. 574, 587 (1986)).

## III.    Analysis

Robinson presents no fewer than 24 separate counts in her Complaint, the first 12 brought

by her personally under D.C.'s Wrongful Death Statute, and the remaining 12 of identical

substance brought on behalf of Arnell's estate under the Survival Statute.  For ease of reference,

the Court will refer to both the decedent and his estate as "Arnell."  The following table sets out

the specifics of the Complaint:

|  | Wrongful Death Act Counts | Survival Act Counts |
|---|---|---|
| **Constitutional Claims** | | |
| Fourth Amendment – Unreasonable Seizure/False Arrest | I | XIII |
| Fourth Amendment – Excessive Force | II | XIV |
| Fifth Amendment – Due Process | III | XV |
| Municipal Liability under 42 U.S.C. § 1983 | IV | XVI |
| **State-Law Claims** | | |
| Negligence | V | XVII |
| Assault | VI | XVIII |
| Battery | VII | XIX |
| Intentional Infliction of Emotional Distress | VIII | XX |
| Negligent Infliction of Emotional Distress | IX | XXI |
| Recklessness / Gross Negligence | X | XXII |
| Negligence in Hiring, Retention, Training & Supervision | XI | XXIII |
| Vicarious Negligence Liability, D.C. Code § 50-1301.01 | XII | XXIV |

The Court notes that Plaintiff alleges Counts V-X and XVII-XXII against both Defendants,

Counts I-III and XIII-XV against Pepperman only, and Counts IV, XI-XII, XVI, and XXIII-

XXIV against the District only.  The Court will follow this labeling, even though certain counts –

*e.g.*, IV and XII – do not constitute separate torts, but are rather theories of vicarious liability.

Defendants now seek summary judgment on all of the wrongful-death counts (I-XII) and

the constitutional claims based on the Survival Act (XIII-XVI).  Plaintiff simultaneously cross-

6

moves for summary judgment as to liability on all counts.  Before turning to the merits, the Court

must address the preliminary issue of Plaintiff's failure to comply with this district's Local

Rules.

A.   <u>Plaintiff's Violation of Local Rule 7(h)</u>

Litigants before this Court are not only expected to follow its Local Rules, they are "duty

bound" to do so.  <u>Texas v. United States</u>, --- F.3d ----, 2015 WL 4910078, at *5 (D.C. Cir. Aug.

18, 2015) (citation and quotation marks omitted).  Here, Defendants charge Robinson with

failing to comply with Local Rule 7(h), which governs litigants' conduct in summary-judgment

pleadings.  The rule has two components.  A party that moves for summary judgment must,

along with its motion, submit a "statement of material facts" in a manner specified by the rule.

<u>See</u> LCvR 7(h)(1).  In similar fashion, when opposing an adversary's motion for summary

judgment, a party must submit a "separate concise statement of genuine issues" that sets forth

"all material facts" that it believes remain in dispute.  <u>Id.</u>

Defendants assert Robinson has violated both obligations, and they ask this Court to (a)

deny Plaintiff's Motion for Summary Judgment, and (b) treat their own statement of facts as

conceded – a sanction contemplated by the rule itself.  <u>See id.</u>  ("[T]he court may assume that

facts identified by the moving party in its statement of material facts are admitted, unless such a

fact is controverted in the statement of genuine issues filed in opposition to the motion.").  While

penalizing litigants for violating local rules may seem unduly formalistic, the purposes here are

sound and sensible.  Rule 7(h) provides for the efficient filtering of information essential to the

dispositive motion at issue:

> The moving party's statement specifies the material facts and directs
> the district judge and the opponent of summary judgment to the parts
> of the record which the movant believes support his statement. The
> opponent then has the opportunity to respond by filing a

> counterstatement and affidavits showing genuine factual issues. The
> procedure contemplated by the rule thus isolates the facts that the
> parties assert are material, distinguishes disputed from undisputed
> facts, and identifies the pertinent parts of the record.

Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner, 101 F.3d 145, 150-51 (D.C. Cir.

1996) (quoting Gardels v. CIA, 637 F.2d 770, 773 (D.C. Cir. 1980) and discussing Rule 7(h)'s

predecessor, Rule 108(h)).  In this way, the parties, "who are most familiar with the litigation and

the record," are able to "crystallize for the district court the material facts and relevant portions

of the record," rather than forcing the Court to waste efforts "sift[ing] and sort[ing] through the

record" itself.  Id. at 151, 153.

Rule 7(h)'s incentive structure is particularly apt here, where Plaintiff's counsel has

seemingly gone out of his way to confound the Court.  The list of undesirables includes, among

other things: appending over 40 exhibits without including any labels or identifying information;

including as "one" exhibit the entire 4,000-page volume of documents produced by the District

during discovery, most of which are not cited by Plaintiff; quoting exhibits without providing

citations; filing a digressive and prolix 50-page brief – with expanded margins, no less – with a

fit and finish more akin to a law student's hastily drafted exam response than a professional,

well-groomed submission; and, in like fashion, saving space by abbreviating Plaintiff and

Defendant as "P" and "D."  Although counsel, who has been warned before about his

submissions, had time to file this plethora of material, he could not be bothered to comply with

an important rule.

Despite these shortcomings, granting all of Defendants' requested sanctions would be

particularly draconian here, where their statement of facts would, if conceded by Plaintiff, almost

assuredly require judgment as a matter of law against her.  Such a result would be particularly

unfair since Plaintiff has included statements of fact within her briefs and clearly notes conflicts

in the record that do create a material dispute of fact.  Fortunately for Robinson, the sanction

expressed in Rule 7(h) is permissive, and thus the Court "may," but is not required to, "assume

that facts identified by the moving party in its statement of material facts are admitted."  LCvR

7(h)(1); see also Arrington v. United States, 473 F.3d 329, 335 (D.C. Cir. 2006).  It will decline

to do so here, instead considering facts in the record in requiring Defendants to prove that they

are entitled to summary judgment.  On the other hand, because Plaintiff failed to file a statement

of material facts along with her own Motion, the Court will deny that Motion in full as a sanction

for non-compliance.  As the facts are generally disputed, moreover, Robinson is not prejudiced

since she would not have been successful anyway.

      B.  Defendants' Motion for Summary Judgment

      Defendants raise four challenges to Plaintiff's case.  They argue first that Robinson's

twelve wrongful-death counts (I-XII) should be dismissed because she claims only "personal"

damages from harms inflicted directly upon her.  According to Defendants, because she suffered

no direct harm (unlike Arnell), and because the wrongful-death statute does not provide for

emotional-distress damages, all 12 counts must be dismissed.  Second, they argue that, even if

Robinson may bring those claims, at least two counts – Count X (recklessness/gross negligence)

and Count XII (vicarious liability under D.C. Code § 50-1301.01) – must be dismissed because

neither serves as a stand-alone cause of action.  Third, Defendants maintain that Plaintiff has

failed to adduce sufficient facts to support Arnell's constitutional counts against Pepperman (I-III

and XIII-XV).  And finally, the District argues that Plaintiff's facts are too meager to hold the

city liable for Pepperman's conduct.  After explaining the differences between D.C.'s wrongful-

death and survival statutes – which has caused some confusion for Defendants – the Court will

address each of their arguments in turn.

1.  *Overview of Statutes*

"Under District of Columbia law, negligent conduct resulting in death gives rise to two independent rights of action, one under the Wrongful Death Act and one under the Survival Act . . . ."  Semler v. Psychiatric Inst. of Washington, D. C., Inc., 575 F.2d 922, 924 (D.C. Cir. 1978); see D.C. Code § 16-2701 (codification of Wrongful Death Act); § 12-101 (codification of Survival Act).  Both give rise to damages, see Semler, 575 F.3d at 924, but the statutes serve distinct purposes, and the damages allowed under each are tailored accordingly.

The Wrongful Death Act is designed to benefit the decedent's close relatives.  See id. at 924-25.  Its purpose is to allow those relatives, like Robinson, "who might naturally have expected maintenance or assistance from the deceased had he lived, [to] recover compensation from the wrongdoer commensurate with the loss sustained."  Id. at 925; see § 16-2701(b) (designating as beneficiaries only decedent's "spouse," "domestic partner," and "next of kin").  A plaintiff's recovery under the Act comprises three amounts: (1) her expected annual share "in the deceased's earnings multiplied by the decedent's work life expectancy and discounted to present worth," Graves v. United States, 517 F. Supp. 95, 99 (D.D.C. 1981); (2)  "the value of services the decedent would have provided" plaintiff such as "care, education, training, guidance and personal advice," District of Columbia v. Hawkins, 782 A.2d 293, 303 (D.C. 2001); and (3) the costs of "reasonable" burial expenses.  See § 16-2701(b).  The Act makes no provision, however, for a relative to seek damages for grief or emotional distress.  See Runyon v. District of Columbia, 463 F.2d 1319, 1322 (D.C. Cir. 1972) (parties recovering under the Act "may not be compensated for their grief").

A Survival Act action, in comparison, inures to the benefit of the decedent's estate by "preserv[ing] and carr[ying] forward . . . the right of action which the deceased would have had,

had he not died." <u>Semler</u>, 575 F.2d at 925; <u>see</u> § 12-101.  Its purpose here, therefore, is to restore

Arnell's estate to "the position it would have been in had [Arnell's] life not been cut short."

<u>Semler</u>, 575, F3d at 925.  Under that rubric, Arnell's estate is entitled to recover (1) his

"probable net future earnings," less what he "would have used to maintain himself and those

entitled to recover under the Wrongful Death Act," <u>id.</u>, as well as (2) damages for his pain and

suffering – *i.e.*, the "bodily injury, mental anguish, and discomfort he experienced" from the

moment of injury "until his death."  <u>Burton v. United States</u>, 668 F. Supp. 2d 86, 110 (D.D.C.

2009).  With those distinctions in mind, the Court will proceed to address Defendants' challenges

to Robinson's case.

      2. *Wrongful-Death Claims*

Defendants seek complete judgment in their favor on all of Plaintiff's wrongful-death

counts (I-XII) because "Robinson seeks to recover . . . damages on her own behalf," which, they

claim, "she cannot do" under the Wrongful Death Act.  <u>See</u> Def. Mot. at 9.  Simply stated,

Defendants argue that, because tortious acts were not committed against <u>her</u>, she cannot recover

under the Act.  In that vein, Defendants proceed down a lengthy and discursive *non sequitur*,

taking pains to make clear that Robinson herself was not at the scene of the accident and thus

suffered no harm.  <u>See, e.g.</u>, <u>id.</u> at 11 ("no evidence that Defendant Pepperman . . . attempted or

threatened to do physical harm to Robinson"); <u>id.</u> at 12 (no evidence that Pepperman engaged in

"extreme and outrageous conduct . . . personally directed towards Robinson"); <u>id.</u> at 14 (MPD

did not owe Robinson any duty of care because she "was not present at the scene of the

accident").

True enough, perhaps.  But these observations miss the point entirely.  Robinson has not

claimed damages for personal injuries inflicted upon her by Pepperman or other MPD

employees.  And her Complaint seeks no compensation for her own emotional distress.  <u>See</u>
Compl., ¶¶ 38, 125, 127.  Rather, she requests damages that are clearly contemplated by the
statute – *viz.*, "the financial benefits, gifts and other contributions that [she] would have expected
to receive from [Arnell,] . . . including but not limited to pecuniary financial loss and loss of
service."  <u>Id.</u>, ¶ 38.  Robinson will thus be permitted to seek wrongful-death damages for any
actionable tort resulting in Arnell's death.  As will be discussed in the following two sections,
however, not all 12 wrongful-death counts survive, either because the claims are redundant
(Counts X and XII), or because the facts require judgment in Defendants' favor (Count I).

Defendants also halfheartedly question Robinson's standing to bring both her wrongful-
death and Arnell's Survival Act claims, arguing that "it is unclear whether Robinson is the
proper party contemplated by the [statutes] since there is no proof that she was ever appointed
personal representative of [Arnell's] estate."  Def. Mot. at 8 n.3.  Perhaps realizing belatedly that
Plaintiff included as an exhibit proof of her appointment as personal representative, <u>see</u> Pl.
Opp./Mot., ECF No. 93 (Add'l Exhibits), Attach. 2 (Order for Supervision), Defendants have
dropped this argument in their Reply.  The Court thus will not address the issue.  <u>See</u> <u>Hopkins v.
Women's Div., General Bd. of Global Ministries</u>, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("[A]
court may treat those arguments that the plaintiff failed to address [in its reply] as conceded.").

### 3.  *Duplicative State-Law Wrongful-Death Counts*

Defendants next argue that even if Robinson is not barred from bringing all of her
wrongful-death claims, at least Counts X and XII should dismissed because they are duplicative
of other counts she has asserted against Defendants.  The Court agrees.[1]

---

[1] The two parallel counts brought under the Survival Act (Counts XXII and XXIV) follow the same logic.  But
because Defendants have not moved for summary judgment on any of Arnell's non-constitutional Survival Act

*i.*  Count X – Recklessness/Gross Negligence

Plaintiff pleads two counts of state-law torts that differ only in their severity: negligence (Count V) and recklessness/gross negligence (Count X).  Defendants urge judgment in their favor because, generally speaking, the "'District of Columbia does not recognize degrees of negligence.'"  Def. Mot. at 13 (quoting Hernandez v. District of Columbia, 845 F. Supp. 2d 112, 115 (D.D.C. 2012) (citation and quotation marks omitted)).  They are correct.  In the District of Columbia, "courts have traditionally analyzed whether a defendant acted with gross negligence only in limited circumstances where gross negligence is a specific element of a claim or defense, or for equitable reasons."  Hernandez, 845 F. Supp. 2d at 116 (internal citations omitted); see District of Columbia v. Walker, 689 A.2d 40, 44-45 (D.C. 1997) (interpreting D.C. statute with separate definitions for gross and ordinary negligence).  Generally, where a plaintiff "has already alleged a negligence claim, . . . the Court defers to the general rule in the District of Columbia against recognizing degrees of negligence and will dismiss as duplicative plaintiff's claim for gross negligence . . . as a separate basis of liability."  Hernandez, 845 F. Supp. 2d at 116.  Because Robinson "has already alleged a negligence claim," and since "gross negligence is neither a specific element to any claim or defense at issue in this litigation," id., the Court will grant judgment in Defendants' favor on Count X, finding it duplicative of her negligence claim (Count V).

*ii.*  Count XII – District's Liability Under D.C. Code § 50-1301.01

For similar reasons, this Court will grant the District's Motion as to Count XII, which seeks to hold it vicariously liable for any of Pepperman's violations of D.C.'s Motor Vehicle

---

claims, those counts will, at present, survive.  The Court will subsequently inquire of the parties how they wish to proceed on these two – *e.g.*, voluntary dismissal or a renewed motion for summary judgment.

Safety Responsibility Act.  See D.C. Code § 50-1301.01 *et seq.*  The Act places various

obligations on motorists, motor-vehicle owners, and the District government, in an effort "to

promote safe driving, to eliminate the reckless and financially irresponsible driver from the

highways, and to provide for the giving of security and proof of financial responsibility by

persons driving or owning [D.C.-registered] vehicles . . ."  Pub. L. No. 365, 68 Stat. 120, 120

(1954).  What the statute does <u>not</u> do, however, is provide a stand-alone cause of action for

violations of its provisions.  And although it does "create[] a system of vicarious liability" that

permits a plaintiff to recover against both the vehicle's immediate operator and its owner,

<u>Agomo v. Fenty</u>, 916 A.2d 181, 192 (D.C. 2007) (citing § 50-1301.08), Robinson has, in Count

V, already sought to hold the District vicariously liable for Pepperman's negligence based on its

status as his employer.  Because the District does not dispute its liability on that basis, Robinson

has no need to seek recourse under § 50-1301.08.  The Court will thus grant judgment in the

District's favor on Count XII.

> 4. *Constitutional Counts against Pepperman*

As permitted by D.C.'s wrongful-death and survival statutes, Robinson also seeks to

recover damages for constitutional violations committed against Arnell by Pepperman and the

District under 42 U.S.C. § 1983.  That statute provides:

> Every person who, under color of any statute, ordinance, regulation,
> custom, or usage, of any State or Territory or the District of
> Columbia, subjects, or causes to be subjected, any citizen of the
> United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action
> at law, suit in equity, or other proper proceeding for redress . . . .

Robinson claims that Pepperman violated the Fourth and Fifth Amendments of the United States

Constitution, and that the District may be held liable for those violations because it had a policy

or custom of encouraging tactics like those employed by Pepperman against other dirt-bike riders.  Plaintiff lists three constitutional violations by Pepperman and one theory of vicarious liability against the District, each of which is pled under both the Wrongful Death Act and the Survival Act.  The Court treats each pair of counts separately.

> *i.* Counts I and XIII – Fourth Amendment: Unreasonable Seizure/False Arrest

Robinson claims that her son's Fourth Amendment right to be free from both unlawful arrests and unlawful seizures was violated when Pepperman swerved in front of him.  The false-arrest claim, predicated as it is on the occurrence of an actual arrest, Dellums v. Powell, 566 F.2d 167, 175 (D.C. Cir. 1977) (false- or unlawful-arrest claim requires plaintiff to show that an arrest was made and that it was contrary to law), demands little attention.  Although Robinson uses hyperbolic language to claim that the "tak[ing of Arnell's] life by excessive force" is, figuratively (and conclusorily) speaking, the "ultimate arrest," Pl. Opp./Mot. at 15, she does not seriously contend that Pepperman ever arrested Arnell, provide any evidence in support of that allegation, or otherwise argue that the officer's actions constitute an arrest in this jurisdiction. See Pierson v. Ray, 386 U.S. 547, 550 (1967) (looking to state common law to define the contours of constitutional torts under § 1983).

Robinson's unreasonable-seizure claim is similarly infirm because Pepperman had good cause to seize Arnell on account of his illegal dirt-bike riding.  To make out a claim of unreasonable seizure, Robinson must show that (1) the challenged actions constitute a seizure, and (2) the seizure was unreasonable.  See Soldal v. Cook County, Ill., 506 U.S. 56, 61-71 (1992).

On the first element, "'a Fourth Amendment seizure does not occur whenever there is a governmentally caused termination of an individual's freedom of movement (the innocent

passerby), nor even whenever there is a governmentally caused and governmentally <u>desired</u> termination of an individual's freedom of movement (the fleeing felon)'" – as when a "'pursuing police car [seeks] to stop the suspect only by the show of authority represented by flashing lights and continuing pursuit,' but accidentally stop[s] the suspect by crashing into him" – "'but only when there is a governmental termination of freedom of movement <u>through means intentionally applied</u>.'" <u>Cnty. of Sacramento v. Lewis</u>, 523 U.S. 833, 844 (1998) (quoting <u>Brower v. Cnty. of Inyo</u>, 489 U.S. 593, 596-97 (1989) (emphasis in original)).  The latter requirement often proves decisive – and thus "material" for purposes of a summary-judgment motion – in circumstances involving a police officer's using his vehicle to terminate another's freedom of movement.  <u>See</u> <u>Lewis</u>, 523 U.S. at 842-44 (death of motorcyclist resulting from collision with police car during high-speed chase is not Fourth Amendment seizure without showing that police officer deliberately acted to cause crash); <u>Brower</u> 489 U.S. at 597 (arguing in dicta that, in hypothetical circumstance where "police cruiser . . . pull[s] alongside [a] fleeing car and sideswipe[s] it, producing [a] crash, then the termination of the suspect's freedom of movement would [be] a seizure").

Here, the evidence is sufficient, when viewed in the light most favorable to Robinson, for a jury to infer that Pepperman intended to terminate Arnell's freedom of movement by causing the collision.  For instance, Gina Leveque, the passenger in Pepperman's car and his partner, concededly told a fellow MPD officer after the collision that her version of events differed from Pepperman's, stating that "[m]y statement" regarding what transpired "is not going to be the same as his.  He did that on purpose."  ECF No. 94, Attach. 22 (Defendants' Production of Documents, numbered with "DCCR __" and submitted on compact disc) at DCCR 233 (Final Investigative Report of Dec. 7, 2009, MPD Internal Affairs Division); <u>see also</u> <u>id.</u> at DCCR 315-

16 (March 10, 2009, Supplemental Statement of Officer Leveque) (confirming that she stated, "He did that on purpose."); Leveque Depo., 25:19-20 ("During that conversation, I blamed Officer Pepperman for the accident.").  She also stated at one point that he was "laughing" and "giggling" upon seeing the dirt bikes approaching him.  See id. at DCCR 301 (March 7, 2009, Statement of Officer Leveque); id. DCCR 325 (March 8, 2009, Statement of Sergeant Beslow). Additionally, witnesses recounted that the police car "abrupt[ly]" or "suddenly swerve[d]" into the westbound lane of traffic, see Hall Decl., ¶ 6; Hoffman Decl. at 2; Wilson Decl. at 2 – an account that stands in marked contrast to the presentation by Pepperman, who insists that he merely stopped in the middle of the street to allow the motor bikes to pass him on either side. See Pepperman Decl., ¶ 5.

These competing narratives leave a dispute of material fact about whether Pepperman intended to terminate Arnell's movement and, consequently, whether his actions amounted to a Fourth Amendment seizure.  Cf. Johnson v. District of Columbia, 528 F.3d 969, 977 (D.C. Cir. 2008) ("[I]f an excessive force claim turns on which of two conflicting stories best captures what happened on the street," summary judgment "in favor of the defendant official" is inappropriate) (citation and quotation marks omitted).  Although a plaintiff cannot defeat a motion for summary judgment even on "elusive concepts such as motive or intent" with "conclusory allegations, improbable inferences, and unsupported speculation," Sage v. Broad. Publications, Inc., 997 F. Supp. 49, 54 (D.D.C. 1998) (citation and internal quotation marks omitted), that is not the case here.  Robinson has provided clear and concrete evidence from which a reasonable juror could conclude that Pepperman intended to crash into Arnell.

This conclusion does not end the inquiry, however, as Robinson must also show that the seizure was unreasonable.  It is on this point that her "unreasonable seizure" claim – which is

distinct from her "excessive force" claim, discussed *infra* – falters.  The Fourth Amendment

"proscribes only 'unreasonable' . . . seizures." Scott v. United States, 436 U.S. 128, 137 (1978).

A seizure may be unreasonable both because it was unjustified by the circumstances – *i.e.*, the

police lacked probable cause to arrest or reasonable suspicion to seize the suspect – or because

the force used to effectuate it was excessive.  See Graham v. Connor, 490 U.S. 386, 395 (1989)

("[T]he 'reasonableness' of a particular seizure depends not only on when it is made, but also on

how it is carried out.").  It is the former concern that motivates Robinson's unreasonable-seizure

claim, and the latter that guides her excessive-force claim.

As to the former, Pepperman would have been justified in seizing Arnell under the

circumstances.  The reasonableness of a seizure "is not in doubt where [it] is based upon

probable cause." Whren v. United States, 517 U.S. 806, 817 (1996).  Robinson does not dispute

that Arnell was breaking the law at the time of the crash, see D.C. Code § 50-2201.04b(a) ("No

person shall operate at any time . . . [a] dirt bike on public property . . . in the District."), and she

has not argued that Pepperman had insufficient reason to seize (or even arrest) Arnell – a

difficult argument to make given that Pepperman saw the violation occur.  See Atwater v. City of

Lago Vista, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an

individual has committed even a very minor criminal offense in his presence, he may, without

violating the Fourth Amendment, arrest the offender.").  It is also irrelevant that Pepperman

claims he had no subjective intent to "pursue, apprehend, or facilitate an arrest of any of the dirt

bike riders," DSOF, ¶ 11, as an officer's "[s]ubjective intentions play no role in ordinary,

probable-cause Fourth Amendment analysis." Whren, 517 U.S. at 813.  Even if Robinson could

show that a seizure occurred, therefore, she cannot show that it was unreasonable under the

Fourth Amendment.  The Court will, consequently, grant Defendants' Motion as to Counts I and XIII.

ii.   Counts II and XIV – Fourth Amendment: Excessive Force

The Fourth Amendment's prohibition on unreasonable searches and seizures also "encompasses the right to be free from the use of excessive force during an arrest, investigatory stop, or any other seizure."  Armbruster v. Frost, 962 F. Supp. 2d 105, 111 (D.D.C. 2013) (citing Graham, 490 U.S. at 395).  An excessive-force claim shares with an unreasonable-seizure claim the requirement that a Fourth Amendment seizure occurred.  But unlike the former count, in which Plaintiff must show that the seizure was itself unjustified, here she must prove that the force used to carry out that seizure was objectively unreasonable.  See Graham, 490 U.S. at 395 ("[A]ll claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ."); see also Scott v. Harris, 550 U.S. 372, 381 (2007) (In deciding whether force used to carry out a seizure was excessive, the Court must determine "whether [the defendant's] actions were objectively reasonable.").

Answering the latter question requires the Court to "balanc[e] the intrusion on [Arnell]'s Fourth Amendment interests against the governmental interests served by [Pepperman]'s use of force."  Johnson, 528 F.3d at 974.  But if Robinson's account of events are credited, as they must be at this stage, it would be hard to imagine how Pepperman's use of his police car to effectuate a seizure could be anything but excessive.  See Tennessee v. Garner, 471 U.S. 1, 7-12 (1985) (concluding that it was unreasonable to use deadly force as means of seizing fleeing, non-dangerous felon).  What is more, Pepperman insists that he was not "contemplating taking any police action against" Arnell at all.  See DSOF, ¶ 10.  As a consequence, he has mustered no justification to explain how crashing into Arnell would be an objectively reasonable way to

19

respond to the circumstances, nor has he argued that there was no other alternative to the actions

he took.  See Brower, 489 U.S. at 599 (remanding to determine whether it was unreasonable to

set up vehicular roadblock "in such manner as to be likely to kill" fleeing suspect); Brower v.

Cnty. of Inyo, 884 F.2d 1316, 1318 (9th Cir. 1989) (on remand) (noting that reasonableness

inquiry is answered by determining whether "a reasonable non-deadly alternative exist[ed] for

apprehending the suspect").  The Court thus denies Defendants' Motion as to these two counts.

    *iii.* Counts III and XV – Fifth Amendment: Due Process

   Plaintiff's last constitutional claim is anchored in the Fifth Amendment's guarantee of

due process of law, the "'touchstone'" of which "'is protection of the individual against arbitrary

action of government'" that interferes with a citizen's life, liberty, or property.  Cnty. of

Sacramento v. Lewis, 523 U.S. 833, 845 (1998) (quoting Wolff v. McDonnell, 418 U.S. 539, 558

(1974)); see Daniels v. Williams, 474 U.S. 327, 331 (1986) (Due Process clause protects

individuals from "deliberate decisions of government officials to deprive a person of life, liberty,

or property").  In assessing whether government conduct violates the Fifth Amendment – as a

substantive, rather than procedural, matter – the Court must ask whether it was "so egregious, so

outrageous, that it may fairly be said to shock the contemporary conscience."  Lewis, 523 U.S. at

847 n.8.  "[C]onduct intended to injure in some way unjustifiable by any government interest is

the sort of official action most likely to rise to the conscience-shocking level."  Id. at 849.  As

with Robinson's other constitutional claims, a clear factual dispute remains about whether

Pepperman intended to cause the crash – a theory that Robinson will have the opportunity to

explore at trial.  And, if she succeeds, a jury could certainly conclude that Pepperman's conduct

"shock[s] the conscience" under this Circuit's guidance.  See, e.g., Hunter v. District of

Columbia, 943 F.2d 69, 78 (D.C. Cir. 1991) ("Where gratuitous brutalization is involved, less

force oriented towards that end is needed to shock the judicial conscience.  Where some force is

justified, the Constitution may be offended if the force used grossly exceeds that warranted by the circumstances.") (citations and quotation marks omitted).  These counts will, therefore, survive Defendants' Motion.

*iv.*   Counts IV and XVI – The District's Liability

Aiming perhaps at both deeper pockets and a wider societal impact, Plaintiff also alleges that Pepperman's employer, the District of Columbia, should be held liable for all of his allegedly unconstitutional actions because they resulted from the city's wrongful policies or customs.  Robinson contends that MPD either tacitly condoned or had an established practice of encouraging police officers to "intimidate, threaten and bully motorcycle riders in D.C." Compl., ¶ 75; see id., ¶¶ 76-86.  The means for doing so, according to Robinson, included "swerving into motorcyclists' lane of traffic[, thereby] causing the rider to swerve, fall or lose control of the motorcycle."  Id., ¶ 75.

In addition to providing individuals a civil right of action against "person[s]" acting "under color of" state law or custom, § 1983 also allows plaintiffs to recover against municipal employers – which are considered to be "persons" under that statute, see Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 701 (1978) – when "there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation."  City of Canton v. Harris, 489 U.S. 378, 385 (1989); see Warren v. District of Columbia, 353 F.3d 36, 38 (D.C. Cir. 2004).  Monell's requirement of a causal link distinguishes municipal liability under § 1983 from general tort-law principles of *respondeat superior*, which impose liability "solely on the basis of the existence of an employer-employee relationship with a tortfeasor."  Monell, 436 U.S. at 692.

The D.C. Circuit has identified a number of ways by which "policy" may be set by a municipality. First, "the explicit setting of a policy by the government that violates the Constitution."  Baker v. District of Columbia, 326 F.3d 1302, 1306-7 (D.C. Cir. 2003).  Second,

"the adoption through a knowing failure to act by a policy maker of actions by his subordinates that are so consistent that they have become 'custom,'" id., carrying "force of law." City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988).  And third, "the failure of the government to respond to a need (for example, training of employees) in such a manner as to show 'deliberate indifference' to the risk that not addressing the need will result in constitutional violations." Baker, 326 F.3d at 1306 (citing Canton, 489 U.S. at 390).

Although Robinson advances all three theories, the Court need discuss only the last, as Plaintiff has marshalled sufficient evidence from which a jury could reasonably conclude that District policymakers were deliberately indifferent to a clear risk of constitutional violations.

"'Deliberate indifference . . . is determined by analyzing whether the municipality knew or should have known of the risk of constitutional violations,' but did not act." Warren, 353 F.3d at 39 (quoting Baker, 326 F.3d at 1307).  "Although [it] is an objective standard, it involves more than mere negligence. It does not require the city to take reasonable care to discover and prevent constitutional violations. It simply means that, faced with actual or constructive knowledge that its agents will probably violate constitutional rights, the city may not adopt a policy of inaction." Id.  Constructive knowledge may be established inferentially by showing "the widespread extent of the practices, general knowledge of their existence, manifest opportunities and official duty of responsible policymakers to be informed, or combinations of these." Cox v. District of Columbia, 821 F. Supp. 1, 18 (D.D.C. 1993), as amended (May 21, 1993) (quoting Spell v. McDaniel, 824 F.2d 1380, 1391 (4th Cir. 1987)); see also McConney v. City of Houston, 863 F.2d 1180, 1184 (5th Cir. 1989) ("Sufficiently numerous prior incidents of police misconduct, for example, may tend to prove a custom and accession to that custom by the municipality's

policymakers.  Isolated instances, on the other hand, are inadequate to prove knowledge and acquiescence by policymakers.").

To support her deliberate-indifference theory, Robinson gathered approximately 200 first-hand accounts from dirt-bike riders or bystanders who claim that, like the incident in question here, police officers used their vehicles to chase and then hit dirt-bike riders throughout the District.  See generally Pl. Opp./Mot., ECF No. 92, Attach. 18 (Motor Bike Declarations & Affidavits) (submitted on compact disc).  The District, in response, seeks to whittle down the 200 or so to a more digestible (and perhaps less-likely-to-be-liability-inducing) sum by pointing out that only 22 of the statements speak to incidents taking place before the collision at issue – a descriptive observation that Plaintiff does not dispute.  See Pl. Opp./Mot. at 39-41; Def. Mot. at 24-25.[2]

The first question, then, becomes whether Plaintiff may rely on post-collision events to demonstrate the District's "deliberate indifference" to the practice that Robinson believes caused her son's death.  The Court agrees with Defendants that she cannot.  Because Monell requires the municipality's practice to have caused the violation at issue, incidents occurring after the March 6, 2009, collision cannot be used to demonstrate that such a practice was in place on that date. See Qutb v. Ramsey, 285 F. Supp. 2d 33, 45-46 (D.D.C. 2003) (events occurring or known to the District "only after the incident at issue . . . occurred . . . cannot be used to suggest that the District took no action to curb a problem about which it had been put on notice, or that such

---

[2] Citing Motor Bike Decls. No.: 15 (Anthony Canard Brown), 16 (Timothy Harris), 17 (Andre Cole), 18 (Devrin Johnson), 19 (Aarion Johnson), 21 (Roscoe Jones), 22 (David Raines), 23 (Charkia Price), 24 (David Green), 44 (Karon Faizon-Hawk), 71 (Deandre Johnson), 77 (John Simmons), 78 (Erick Thomas Washington), 81 (Tiffany Mace), 90 (Jonathan Marcus Smith), 118 (Mike Wilson), 124 (Jamal Wilson), 138 (Donnell Sims), 143 (Jerome Devante Wilson), 144 (Chris Jones), 145 (Tywan Cummings), and 147 (Michael Lewis).

inaction was the 'moving force' behind plaintiff's injuries"); see also Cox, 821 F. Supp. at 10 n.10 (same).

Not content to rest there, the District seeks to pare back Plaintiff's declarations even further, arguing that only 8 out of the 22 pre-incident declarations "specify that a MPD vehicle was involved."  See Def. Reply at 5 n.3 (citing declarations of Tywan Cummings, Karon Faizon-Hawk, Chris Jones, Michael Lewis, David Raines, Donnell Sims, Jerome Devante Wilson, and Mike Wilson).  From this observation, the District argues that only that smaller subset can be used as proof of a "pattern or practice by MPD" because it is equally plausible that the declarants were targeted not by MPD officers, but by officers who work for one of the other law-enforcement agencies that operates within District borders.  See id.

While the Court agrees that Plaintiff may rely on only the pre-collision incidents to defeat the District's Motion, it is unwilling to further restrict that pool to only those incidents in which declarants or affiants explicitly identify MPD vehicles – even though eight incidents might conceivably suffice to get to a jury.  Cf. Griego v. City of Albuquerque, No. 13-0929, 2015 WL 1906087, at *16 (D.N.M. Apr. 11, 2015) ("[N]o set number [of incidents] is required, and the more unique the misconduct is, and the more similar the incidents are to one another, the smaller the required number will be to render the alleged policy plausible . . . .").  On summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.  Although the District's argument may well prove persuasive at trial, the fact that Plaintiff's declarants have failed to specify that the aggressor worked for MPD does not mean that a jury could not reasonably conclude, based on facts presented to it, that some or all of the other incidents recounted in the 22 declarations – almost all of which occurred in the two years preceding this

24

incident – involved MPD employees.  This is particularly so given that there is no evidence in these other 14 declarations that the incidents occurred in national parks (the bailiwick of the U.S. Park Police), near the Capitol (where U.S. Capitol Police is based), or close to the White House (home of the U.S. Secret Service Uniformed Division).

If the jury decides that some or all of those incidents involved MPD, it could also reasonably conclude that the practice was sufficiently widespread to place District policymakers on notice of the risk of constitutional violations.  See Carter v. District of Columbia, 795 F.2d 116, 124 (D.C. Cir. 1986) (There are no "numerical standard[s] control[ling] the determination whether incidents of wrongful behavior cumulatively show a pattern amounting to a custom or policy."); Oporto v. City of El Paso, No. EP–10–110, 2010 WL 3503457, at *5–6 (W.D. Tex. Sept. 2, 2010) (concluding, on motion to dismiss, that thirty-two incidents of deadly force spanning fifteen years were sufficient to allege pattern); cf. Blakemore v. Coleman, 701 F.2d 967, 970 (D.C. Cir. 1983) ("[A] finding of constructive knowledge is a mixed question of law and fact").  Should Plaintiff fail to provide sufficient proof to establish her claim at trial, the District may certainly move for judgment as a matter of law under Federal Rule of Civil Procedure 50(a).  At this stage, however, with the exception of Robinson's false-arrest and unreasonable-seizure claim, the Court will deny the District's Motion as to her constitutional claims.

## IV.    Conclusion

For the foregoing reasons, the Court will issue a contemporaneous Order granting Defendants' Motion for Summary Judgment as to Counts I, X, XII, and XIII, denying

Defendants' Motion as to all other counts, and denying Plaintiff's Motion for Summary

Judgment in full.


                                              /s/ *James E. Boasberg*
                                              JAMES E. BOASBERG
                                              United States District Judge


Date:   September 15, 2015